Okay, this is one of those cases where you have more than one party on a side. Is there an agreement as to how the time is going to be divided up? And that agreement, one of you can step to the lectern and let us know what that agreement is. Not a problem. We were requesting eight minutes. We being who? Proposed intervener and myself, I'm representing proposed intervener Francis Moreno and Myna Lee. We're requesting that we split it eight minutes, five minutes rebuttal and two minutes closing. Wait a minute, so let's try this again. So I will speak first for eight minutes on behalf of Myna Lee and Francis Moreno. Mr. Amster, on behalf of April Munoz, will take rebuttal for five minutes and then we ask for two minutes closing. I'm not sure what closing is. We have a two minute after, like a post, a post rebuttal. You're proposing to divide the rebuttal time into two pieces. Okay, we can only divide it in two pieces then. Well, what's the closing? Here we have appellant Appley rebuttal. What's the closing? I'm presuming that Los Angeles Unified School District will want to have rebuttal and we're rest. No. Okay. Please don't rebut. Appellants rebut. Okay. And the eight minutes is entirely you. Yes. So we'll hear from you for eight minutes. We'll hear from the school district for their time and then there'll be whatever balance of time is left you propose to divide. Got it. Okay. Yes. Could we have your name please? Yes, it's Suzanne Snowden for proposed intervenors Myna Lee and Francis Moreno. May it please the court. I have a David German for Senator Smith. Barrett Green for the and Seymour Amster. Your name doesn't appear on the sheet. Oh, here is Suzanne Snowden. Okay. Yes. It's written in by hand. Thank you very much. So we have we have two separate sets of proposed intervenors. So who represents whom? I represent proposed intervenors Myna Lee and Francis Moreno. Okay. And I take it you are, you know, need a scorecard here. We do. So 15 minutes shown there you're planning to take eight of it. So seven becomes the magic number you're looking for. Okay. Got it. Okay. Thank you, Your Honor. This is a case where hundreds of moderately to severely disabled students were uprooted from their placements on special education centers and forced onto general education campuses beginning in the 2013-2014 school year. Many of these students were moved from their placement in the IEPs. These moderately to severely disabled students are the most vulnerable of our community. These are students who are cognitively impaired, nonverbal, and many of them are blind and visually impaired. Don't you know what your opponent is going to argue in response to that? And why don't you, well, you do use your time any way you want, but you... Well, I'm presuming that they're going to argue that integration is, because that has been consistently what they're arguing, but integration alone is is not something that can be, you know, have to look at the individual child. Ms. Snowden, I don't think that's what they're going to argue. You're appealing from a judgment of the district court. The judgment denied your motion to intervene, not on the grounds that integration isn't of value. It denied your motion to intervene on one ground and one ground only, and that ground was that your position was not timely. Correct. Unless I missed my guess, that's exactly what they're going to argue, that it wasn't timely. Why don't you tell me why the district court was wrong as to its timeliness decision? Thank you, Your Honor. Yes, Judge Bay. The reason why it is timely is because the movement of the students from the special education centers on to general education placement completely changed the stage of the proceedings. Before this, special education centers, the children that was part of the continuum of placement options, as stipulated to in the modified consent decree. Let's suppose that you're absolutely correct. Yes. There was a change of circumstances which set the timeliness clock running anew. Yes. What was wrong with Judge Liu's determination that you knew about the revised outcome number seven as of August 2013, and the petitions to 79 days later, which he found was an unreasonable delay and grounds for denying the petition? What's wrong with his determination? His determination was incorrect in our position because you can't take timeliness in a vacuum, first most. Secondly, timeliness shouldn't be an element to punish the dilatory. So what realistically happened from August to October was both Mr. Amster and Mr. Jacobson had collected multiple declarations from families, current families, many of whom speak Spanish only, declarations from current staff members, past staff members. I would like to follow your argument better if there were some evidence in the record on the motion to intervene from the attorneys stating what they did between August and October 2013 and why it took so much time to do that. But there isn't. Well, Your Honor, and with with all due respect, the other element that we believe Judge Liu didn't consider was that there was no prejudice to the Los Angeles Unified School District. What I'm trying to get at is this and help me if you would point to me some evidence in the record which explains or justifies the delay from August 2013 until October 2013 in filing the motion. For instance, a declaration by an attorney was figured at L amount of dollars and we had to go out and get this money and it took time to get it. That sort of thing isn't in the record. Well, what is in the record that justifies the 71 and 79 day delays? Well, the record itself documents multiple declarations and it documents multiple evidentiary pictures, pictures of harm. And I guess what I would ask the court to consider is that instead of focusing narrowly on the 71 days and the 79 days, which at some point becomes punitive to those attorneys who have full time practices and are doing this pro bono, and instead look at the harm to the students, which could have been mitigated had class counsel asked for an urgent action under section 14 of the modified consent decree. Had he done that, the office of the independent monitor could have ordered a cease and desist order preventing the Los Angeles Unified School District from moving all these students. Was there a motion to Judge Liu asking that that be done? But we don't have standing, Your Honor. At this point, we don't have standing to ask Judge Liu to do anything. Was that part of the reason given as to the intent to the motion to intervene? I guess what you're telling me is that there's really nothing in the record that tells us, in the record, what Amster and what the other attorneys were doing between August and October 2013, right? I believe that the record does show several documentation, but there is not a declaration stating... The record doesn't show it if it's only stated in a brief. Briefs are assertions. Declarations are evidence. I'm asking you whether there's any evidence as to what was going on in that four-month period of time that would justify the delay or the two-month period of time. Well, I don't believe there is, Your Honor. All right. Thank you. Except you've referred to the fruits of that effort. That is, you're asking us to look to the actual evidence that was submitted and infer from that that some degree of time was needed. Yes, and we would also ask the court to consider that two proposed interveners, acting independently of each other, filed motions relatively within the same period. We would also ask the court to consider the harm to the students, and that's really... Which students are we talking about here? Moderately to severely disabled students who have been moved from... Let me refocus the question, because it seems to me, are we talking about the interveners, or is this something of a class proceeding? It's a class proceeding. It's the students who we sought intervention as a class for those families who wanted to have their placement remain special education centers, but was denied via an usurpation of their power from the Los Angeles Unified School District. As my understanding, we get a lot of IDEA cases. The IEP is the governing document. Is there any evidence of specific instances of a student whose IEP provides for the special education placement who was transferred in violation or in disregard of that? Yes, Your Honor. It was Cecilia Chamu, Ms. Flores, Cecilia Chamu, Myna Lee, and Frances Moreno, all filed declarations stating that their child's placement had been moved outside of the IEP process. I would also like to point out that collectively, these parents don't have They had asked for representation for class council. Class council said no. They weren't going to represent them because he believes special education centers, even though they're stipulated to in the modified consent decree, were illegal. What is further concerning is that a year later, class council did file a request with the Office of the Independent Monitor to take action against the Los Angeles Unified School District, doing the very thing that we asked him to raise a year before, which was that the Los Angeles Unified School District was systemically making placement decisions for students who were in a more restrictive environment to a less restrictive environment without parental involvement and outside of the IEP process. I'm not sure I understand. So you're saying that a year later, class council lodged the complaint that you were urging a year before? Correct. Okay. I should also note, we're already down to five minutes instead of seven. I just want to add that something's very wrong where parents of severely to moderately disabled students have to rely on class council to pick and choose which most restrictive environment he's going to file against. Our clients, he didn't file against them, and as a result, they were moved without parental consent, and we argue that there's harm, and that should be weighed against any factor of timeliness. Thank you, Your Honors. Thank you. Now, before we start the clock, let me ask, is there a division coming up on this side of the room? Yes. Yes, Your Honor. Roughly seven and a half minutes each, but if I end early, if it's okay with the Court, I'll pass it to Mr. German. I just want to focus on the ---- Introduce yourself. Oh, I'm sorry. May it please the Court, Barrett Green for the school district. I want to focus on some of the things that were raised just now in the argument. On the timeliness, one thing in addition to what came up in the argument is where are we in the stage of the proceedings? I mean, this is a consent decree that's been going on for 20 years. Isn't it totally irrelevant of Judge Liu to mention this is going on for 20 years when these children weren't even born? No, it isn't, Your Honor. Why? The reason it's not irrelevant is that there's always been a key component of the consent decree that says that integration, least restrictive environment, is the law, and that the problem before they were involved is that there was not enough integration. But wasn't there a sizable and totally unprecedented change in 2013 when a strict quota, not a goal, a strict quota of 33 percent decrease in children to be in SEC special education centers? That was a change of circumstance. You'll agree, right? No, Your Honor. Oh, is it just another modification? Well, Your Honor, the one thing that's really important about the IDEA is that it  And that's why ---- What is unique about 33 percent who have not been examined individually and are lopped off? Any student tomorrow, Your Honor, in a IEP team meeting, it is believed by the parents or the team that they should be at a special ed center. There are special ed centers available, and they will be placed there. We just heard there were students transferred inconsistently with the IEP. At least that allegation is on the table. Well, I don't think the evidence actually supports that. So you accept the proposition the IEP should rule? Well, the IEP should rule, and when there's a dispute, there's a due process hearing. That's how it works. The problem that I have here, and I don't know that this is going to be answered by this case, is that I share Judge Bea's concern. Where does this 33 percent number come from? Because it seems to me what's happening here is that there's an agreement, and it's driven by the statute, that we're trying to mainstream students, and so we're going to shift more students. There's an agreement to do this number, and I'm going to ask you in a moment where the heck the 33 percent came from. And what's going to happen is that the students whose parents aren't engaged in the process, and sadly we have to acknowledge there are thousands of students in the district whose parents really aren't very engaged, those are the ones that are going to get most affected, because if their families aren't fighting for them, those are the ones that are going to get transferred because the school district has to meet the quota. So where's the quota come from? I'm not sure where the exact number came from. Isn't that damning? No, Your Honor. Let me explain why. Wait a minute. You're telling me we don't know where this 33 percent came from, but we're going to shift 33 percent of the students from one to another. You know, it's quite ironic, Your Honor, that we're arguing about this issue because 99 percent of cases involving the IDEA are parents who are dying for integration, and the school district is saying it's too expensive. So the idea that we'd like the world is upside down in this case, where we're all complaining, or the other side is complaining, about how it's so unfair that these children are being integrated into the regular environment. Let me add something, Your Honor. The special ed centers aren't even a requirement under the law. There's nothing in the IDEA about continuum of services of special ed centers. All special ed centers are are special day classes that happen to be in their own campus. Ninety-five percent of school districts don't have special ed centers. If you need a non-public school because you can't be with any children who are non-disabled, that's available also. So this idea that these poor children who are being segregated, we should not move them into the mainstream, and that we're punishing them by moving them in, I mean, it's just all upside down, Your Honor. Well, it's certainly not the majority, because we see cases like you just described. But there are at least some families that have a different view, and their complaint is that to meet this quota, their kids are being shuttled someplace where they don't want them to go. I'm happy you brought that up, because what's critical about the IDEA is the uniqueness of each child. What the plaintiffs are, the interveners are doing in this case, is trying to lump everybody together. Not only is it the same. Well, yes, but no, because their complaint is that the class council has done exactly that and is not willing to consider their particular objections. Your Honor, I will tell you, I will guarantee you that if these interveners were allowed to succeed and get their way, you will have picketing outside this courtroom from all of the persons. We've had that happen before. Right. Coming forward saying it's not. It won't surprise some of us. We've dealt with that. That's not going to turn the day. But I'm just saying that there's a lot of interveners, Your Honors, that do not, who would propose to intervene, who would not want this. It's the vast. All you're hearing is one subset. Members of the proposed intervener class, I mean, I take as a given, if your name is on the paper, then you're probably supporting the position whose name is on the paper. And every one of those persons has a right to their unique treatment. And yet we just heard names of people, I obviously don't know the facts, but I asked and we heard the names of people who allege that their children were transferred over the parents' objections. You know, it may seem like it, Your Honor, but these are not unsophisticated parents. I checked and almost every parent in this case has filed a due process hearing at some point or other in the past, probably represented by the same attorneys. They know exactly how the system works. If they don't like a placement proposed by the IEP team, there's a due process hearing and it comes right back to this Court. You have every right to judge. Which is why my concern is, that I voiced before, what about the kids whose parents really don't care and don't get engaged? Well, I think. And do we have a reason to believe that one-third of the students in the special education centers should be shifted if we don't know where the one-third number came from? But, you know, I can point out that in the case that Judge Farris and you were on in the Hawaii case, it cites to the concerned parents case where they say it doesn't matter where the actual class is located. Okay? So if you have a special day class that happens to be at a special ed center and you co-locate it with a regular ed school and you have all the supports, there's no shifting at all. It's not like they've been kicked out. So that also is misleading to say that special ed centers, or they're being kicked out of the special ed center. It's not the location. It's the services. And they have every right to complain about it. I have one minute before I pass the torch. I didn't know if Judge Farris had a question. The question is, nobody said it, but I think it's a fact. There are two theories to how better to handle the situation. Some think there should be special education and special classes. Others think they should be integrated into the regular classroom. And the battle was fought. And unfortunately for the ones who felt strongly that there should be special education classes, the decision was integrate them to the extent you can into the regular classroom. Now, the problem I have is I read it, and I think we all are fairly certain that any judge would read it sympathetically. But how do we make the call? How do we decide this is wrong and that would be right on this record? The answer is that this record does not support taking all those parents and children who want the mainstreaming, which is Congress's desire, and giving them the way of the interveners in this case. The record supports saying if you have an individual child and you don't like your placement and you don't believe in integration, you pursue your own claim. Mr. Green. Yes. At the beginning of this case, the same argument could have been made that this individual parent had a due process hearing right. And yet the court found that the class action was a more suitable method of achieving the relief class-wide than these individual actions. Why doesn't the same argument mean that these individual actions are not adequate relief at the present time? Because throughout the consent decree, you see one imprimatur, which is that integration was not being carried out effectively. You don't see the opposite. You don't see in that consent decree, oh, we want to segregate more, and the district is being ineffective. That's why. And why wasn't the class action dismissed and said everybody is on their own? Because there's a number of outcomes, and not all of them have been met. Almost all of them. Because the number of outcomes was necessary to achieve the relief that was requested for the class. I think you've answered my question. I'm going to just do one thing. My apologies, because I don't want to take all Mr. German's time. I just want to add one thing, because there was a statement made that the only ground of the district court was timeliness. But I wanted to clarify that the district court also found the third ground, practical impairment, was not met. And I believe the evidence heavily supports that on grounds that these interveners can seek their own remedy through the due process hearing process. Thank you, Your Honor. May it please the Court, David German for Plaintiff Appellees. I think I'd like to go ahead and head straight at the quota concern. In considering whether the district court's decision was an abuse of discretion, I think it's important to – there's facts in the record which can kind of frame this question in a way that shows that it really wasn't a change in circumstances. The process of reducing the district's unnecessary reliance on segregated schools began decades ago. Proposed interveners described cataclysmic consequences to revised Outcome 7, but the record simply does not support the fact that – Where does the 33 percent figure come from? School district apparently doesn't know. You know, I wasn't in the room, but I can explain how that makes – how the 33 percent makes perfect sense. If we go – if you go back to Frederick Weintraub, the previous independent monitor's declaration, he believes the reason that this outcome was revised in the first place, the reason they said, hey, let's take a break and take a look at this, get some papers, have some meetings about this, was because there was a fear that continuing on this with the same version of the revised outcome that had been in place since 2007 – no, 2008 would require the arbitrary transfer of some of the students on those sites. That was related in one of the documents, that there would be arbitrary transfer. In – that was what they were concerned about, was that there might be – with the old version. And so they did all these studies – What's so non-arbitrary about 33 percent? Well, give me a second. Let me play it out a little bit to – so the district has historically had a hugely disproportionate reliance on the use of segregated campuses to educate students with moderate to severe disabilities. This over-reliance has steadily been reduced, but as noted in footnote 6 of the district's brief, at the time this motion was considered, the district still had twice the percentage of students on segregated sites that the state was seeking as an average. When this case started, students with moderate to severe disabilities who were entering the district were always tracked into segregated sites. There was no consideration that they might be educated in an integrated environment. And those kids stayed there. They stayed in a separate system all the way through from the time they were 3 until they were 22. That has changed. And IEPs now start with the premise that most students with substantial disability-related needs can and should be educated in programs located in the same buildings as their non-disabled peers. Because appropriate classrooms are now established in local general education schools across the district, kids with pretty substantial needs can be educated in the schools that their brothers and sisters go to in their neighborhood. The only explicit preference in the IDEA for where kids go to school, where placements are, is it should be as close as possible to their neighborhood school with their non-disabled peers. It was inevitable that over time, you have 10, 15, 20 years of taking this idea seriously that kids should be given a chance to be educated with their peers, with their non-disabled peers, before they're sent off into the segregated system. Because they don't come back, right? Before they're sent off into the segregated system for 18 years of education. Taking that seriously, letting IEP teams make the decision about whether young children can be effectively educated with their non-disabled peers. Inevitably, over time, if you stop the number of people entering because you're giving them general education placements completely in accord with the law, or not general education placements, I apologize. Placements, yes? But sir, these people just want to have a voice in the decision. They disagree with your ideological commitment to integration of... It's not my ideological commitment, Your Honor. It's Congress's. It's Congress's. But Congress has also provided for special education. It's a question of degree. They want a voice in the outcome. And they're not being allowed to be a member of the class that's affected. It's absolutely not true. They're members of the class, but they don't speak separately for themselves. Right. And their complaint is that class counsel isn't speaking for them. The core aspect... I mean, I want to get back to the 33%, but first let me... By the way, a point that Judge Clitson made. You keep talking about the availability of individual actions if they don't like, or at least your co-counsel did. As I understand it, the designation of the class binds these parties to the class. They would be subject to issue preclusion as to whether children are sent. Look to paragraph 93, 93B of the consent decree. It explicitly holds there is no issue preclusion for individual claims brought by parents on behalf of their children seeking compliance with the dictates of the IDEA or for any other individual claims. There's absolutely no issue preclusion in this case. And that is why... Thank you. You've given me a citation. Go ahead. Okay. And do speak to the 33%, and even if it goes over time, because this is important for us to hear. Okay. So given the established pace of ongoing... So this had been going on for a long time, right? They really had changed. When this case started, kids didn't enter. They had no chance to enter non-segregated sites. And this had really changed. So the 33% reduction was actually not a change in the pace at all of the integration. And I'm just going to use figures within the record that have been cited by... I'm going to use the most conservative figures cited by proposed interveners to show you why there hasn't been a change in the stage of the proceeding. Pardon me, counsel. Yes. Outcome number seven before 2012 had two classes. 51% of the moderately severely disabled would spend 60% of their time in general education and 49% would spend zero time in special education. Now, 33%... I don't believe it was zero. I think it was zero to... No, no, no, no. There's no revised outcome seven. It doesn't require that any student spend any time. 4%. A child who cannot... Can't answer the question unless you let him answer it. I apologize, Your Honor. 49% of moderately severe students can be educated in SECs or in private schools or in SEC classes in general education facilities, but they weren't required to spend any time in general education facilities. Now they are. It's not the case. It's not the case? No, there's still roughly 1,500 students on segregated sites, and there's a massive number of kids, 3,000, 4,000 kids in non-public schools contracted by the district. There are dozens of non-public schools contracted by the district to fulfill this same place on the continuum. There's no requirement that any district... Most districts have no segregated sites that they maintain by themselves. Now, 33% of those who were before in that 49% will be 100% in general education campuses, right? No. Because of the reduction in the quota reduction. Not necessarily because it's not the same kids. Let me... It's not necessarily... That 33%, it's a reduction in... Let me... Give me one second to pull this out, and then I'll get back to that. So if you take the 2002 intervention motion supported by some of the attorneys for proposed interveners, they cited a figure of 4,600 students in 2002 that were on segregated campuses. That number had been reduced by the time Revised Outcome 7 was adopted in September of 2012 to 2,190. That works out to a reduction over the course of a decade of 241 students a year. The 33% number requires 241 students to be moved over the course of a year. So that is just basically an approximation of what the natural attrition would be. They also cite at several places throughout the record, I can give you the sites... 33% of 2,000 is 200? I think it's 600. It's 241 students a year for three years. For three years.  They also cite at several places throughout the record a figure of 5,000 students in 2002. So that would have meant that over the decade prior to Revised Outcome 7 being adopted, there were an average of 281 students a year who left these sites, and that for the three years after, there was a requirement that the district aim at 241 students a year. So it was actually a reduction in the pace. And the way that this reduction happens is there are very few students entering these sites. Students age out every year. And the district is making the investment to put... It costs a huge amount of money and work to get an appropriate classroom opened on a general education campus because what happens, what they're talking about is taking the entire infrastructure of a classroom for children with very substantial disabilities and moving it onto a general education site. So they're saying... It's not that they're stocking a class with kids without disabilities. They're moving... Some of the classes stay at all of these sites... I mean, most of these sites, even the ones that they have alleged have been closed. Many of the classrooms are still open in their original room. So they move everything. They move the teachers, the aides, the equipment. But to take a concrete example about what Revised Outcome 7, just to kind of give you a picture of why it's not a quota and what they're really doing, if you take the co-located sites, McBride and Grandview are two of the co-located sites. And what that means is there's one piece of property that the district owns. On one side, there's a school for children with moderate to severe disabilities. On the other side, there's a school for everybody else. And right down the middle, there's a big chain-link fence. All that the district and Plaintiffs' Council are trying to do with Revised Outcome 7 was support the district's decision to take the fence down and allow those children the chance to interact somewhat. They're not changing their program. They're not saying, we're not going to give you the huge amount of support that you need and all the supplemental services and the aides. On those two sites, which have been combined, some of the students with disabilities that were previously in the segregated site stayed. They're still in their exact same classroom. The only change, with the same services and everything, the only change is that in their building, there are now classrooms that have children without disabilities. And that is exactly what the law anticipates, that you have to provide everything that's in the IEPs, but you don't have to lock children away. They can be near each other. I'm not sure that's telling me there's logic behind the 33% figure, which is unbelievably a quota. It's saying that we can achieve that without really affecting anybody. That's something different. Well, this is an outcome-based... There's 18 numerically-based outcomes. These are just indications of, have we sufficiently reached a level of... It was a negotiated figure, right? It was a negotiated figure. And they didn't form part of the people who negotiated it. Well, I think it's very important to realize that the reason they stopped the last one, that they decided to revise it, was because of a fear that the way they had it set up before would create an arbitrary transfer of one student. They were concerned one or more students would have to be moved arbitrarily. How is this the same problem not posed by this? But I think that's part of it, is that the idea that they did all these studies, had all these meetings, and then ended up adopting something which inevitably required the exact same thing, it doesn't make any sense. And the way the record was just represented, that there are students whose IEPs say one thing and they've been forced to move somewhere else, this is not a case like ND. This is not a case like the New York case in Citizens, like ND versus Hawaii, where two members of this panel were involved. Those were cases... In Hawaii, there was no IEP process, right? In Hawaii, there was no IEP process, and the children had no opportunity to object. The state just said, we're going to shut this down for 17 days. In the New York case that the court relied on in ND, the district had just sent out a letter in August, right before school, saying all the kids' classrooms are moving. And that's not what happened here. Here, there were IEP meetings for every single kid. What they're saying, when they say people were moved against their IEP, is not that the district didn't make an offer of an IEP, and it's that they didn't get what they wanted. And that happens all over the place, that the district will offer a placement that a parent feels is inappropriate. And we get lots of cases that fall out of that. We're real aware of that. The way to address that is through a due process hearing, but you can't do it from 30,000 feet. They're incredibly fact-dependent situations. What's your view of what our decision should be? And I ask you now because he's going to rebut, and I'd like for them to know precisely what you're asking us to do so that they can tell us why we shouldn't. Well, I mean, I believe you should affirm that it's untimely because there really was the timelines are much longer than what the Court represents. The August timeline was after several arguendos. It was a very counterfactual situation. The difficulty, though, of course, in making that ruling is we have to know when it started. And their reason on this record to believe that they couldn't know what was going to happen or what was anticipated until a certain point. And it's pretty difficult to find out, boom, that's what that certain point was. That's what creates a problem when you talk about delay. The difference between this record and what they assert over and over again in their briefs is that the record doesn't show that Revised Outcome 7 entailed any dramatic changes. On the face of it, it doesn't require them to do anything. They're saying once Revised Outcome 7 happened, all these things happened. But really the truth of the matter is, you know, this had been happening for 15 years. At some point, there's some kind of tipping point where, you know, 18 stand-alone special education centers each with 15 kids in it is not a viable thing to require the district to do. There's nothing in the law that says they have to maintain this massive system. If you look at the declarations of the experts that were submitted in the district court, I mean, this district has relied far more heavily than other major urban school districts on this segregated system. There's no need to. Well, that's the position that's been taken by class counsel. The issue before us now is whether somebody else should be allowed to step forward to speak to the contrary. And that actually raises one question because this case has been around for so long. Are any of the plaintiffs still directly involved? Do they have children in schools? Well, there still are, I believe... You know, I can't speak exactly. I believe that there still are members of the parent counsel whose children have passed away who had quite severe disabilities who were part of the original class and have been involved since day one. Any current students? I don't think so. I mean, it's now, you know, 23 years. Which may raise a standing question at some point. You might want to consider... But it's a question that would come up in any institutional reform case. Here's my concern. And this speaks to the intervention issue. You've got parties in a room negotiating these terms. And class counsel represents a view that is certainly endorsed by the legislation, but is not the only view of parents. And the question is, should somebody who has a different view be allowed to step in, or they are required to accept the representation of class counsel who's not interested in asserting the view that they want to assert? Even if we did assert that view, it wouldn't get them anything. The way to get their argument that this structural change should be stopped before this court is to do exactly what the people in ND did. The consent decree does not have preclusive effect. Just like in ND, they could have come in and filed a motion for injunction. But the question I posed a while ago was, isn't the problem that's hidden here the families that don't participate? I mean, if you've got somebody who's a vigorous advocate, they will pursue the IEP. They will pursue the due process hearing. They will look out for their child. But a lot of parents aren't sufficiently engaged. It seems to me one of the problems with this plan is it invites the school district to satisfy its quota obligation by dealing with the students whose parents aren't going to fight back. So shouldn't there be another voice in the room before a quota is imposed? It's like you and me agree to have this person's life be changed. And if that person's parent isn't engaged, that person's life is changed. Well, why shouldn't somebody looking out for that person be involved in the discussion as well? And I think that's what the intervention proposal is about. Had there been any sense by class counsel that they were going to do this arbitrarily, they were not going to invest the resources, they were not going to be bound by their obligations? But they had a different view from the plaintiffs. Well, but, you know, so the current independent... You're 12 minutes and 50 seconds over. We got you there. If I could make one more point, one more point. I mean, I really believe that what we've been talking about is the legal question that the court addressed in ND v. Hawaii. That legal question was, you know, do these things, do these administrative actions by a district constitute a change in placement? And that's simply, that never got before this court because they didn't take the opportunity to file, they didn't have to wait 70 days or however long to get declarations. They could have gone in with one plaintiff, said, stop it. And it would have gotten right before the court and it would be here now, or here a long time ago. And that's the only way to do it. I don't know how, from where we sit, to stop LAUSD from doing something that's completely legal. The sites are still an option on the continuum. They are still bound by federal law in every single one of these IEPs. They have to fulfill the procedural requirements. I don't think you're proposing that this lawsuit and class council participation has been redundant. I would not like the court to find that. I suspect you wouldn't. And so it's not purely a matter of, I mean, you can tell us you're not stopping the district from doing anything. And obviously you're not. But the district is being motivated to do something because they're getting pushed hard and have been pushed hard for 20-some years by this lawsuit. And that is to the credit of the lawsuit and the efforts of class council. But to suggest that this is simply the school district acting on its own and that there's no reason to have anybody talking to them, that's just not the way to do it. But really the class here, this comes up. I mean, this is the group of parents in a desegregation case that's saying, actually, we don't care about whether or not we get integration. We just want this. We want a better school right where our school was and we want it the same. And I may share your obvious sense that the position is not meritorious. Okay. But why shouldn't the position be heard? Well, I don't believe... And the denial of intervention seems to have that effect. Well, you know, as a practical matter, allowing them to take over as class council and intervene or even intervene as a subclass when we're, you know... I mean, when we're at the very tail end... No, wait a minute. Didn't the independent council say that there would be another two or two and a half years before this would be wound up? So we got two, two and a half years. Well, that's now... But, you know, but all of these have actually been... I mean, all of the outcomes except one have actually been met. Then you have two that are outstanding besides this one? You know, it's outside the record, but because it's part of the... No, there was only... This was one of the two. Since they're referring to... They referred to a complaint that we filed about the, you know, some of the procedural issues that they're concerned about, in that exact same document in the independent monitor's report in 2015, the independent monitor certified that all of the things he had found in 2014 that he, you know, that he required them to fix had, in fact, been fixed and that they had met this outcome. So there was no further motion occurring. They met outcome seven, both parts of it already. That's not the way I saw the record. No, right. I only bring that up because they refer to a document extensively where that determination was made, and it's a public document. Thank you. Thank you. If it pleases your honors, I want to address some points straight off. The 33% declaration of April Munoz, declaration of Steven Misada. Now, I'm going to be stating my arguments based on declarations factual in the record. I can go outside the record and counter everything that counsel stated that all the principals in LAUSD would disagree with, but I want to stay with what our factual record is. At the meeting in August, where you had all the stakeholders, UTLA, Local 99, parents, and counsel, complaining about how these children were at extreme risk and danger, and the question was asked of Mr. Myers, how did you come up with the 33% figure? He said, we just basically pulled it out of the air. There was no negotiations. There was no data behind it. There was nothing. Why did they have to pull it out of the air? Because they had to force children that were in the special education centers on the general education campuses. Now, remember, each of these children were on a special education center after an IEP team had concluded the individualized needs of the child. Well, but the IEPs customarily speak of the immediate context, but does the immediate context have to be at a special education center, or can it be with an integrated facility? The IEP could consider both. So your answer is yes, except... We get a lot of IDEA cases, and it's pretty unusual to have, at least these days, to have the kind of special education centers we've had described to us. I understand. And this was the unusual situation. We're talking about a small class of children that needed the special education center. So you had a history of the special education center always being determined appropriate by your IEP team, and it's only when Revised Outcome 7 goes into effect, a generalized plan, that there is a means of changing the placement decision, not based upon the individual needs of the child, but based upon the outcome. And if you look at Michael Golona's declaration and others, you will see where you had the IEP before Revised Outcome 7 saying special education center and the same exact individualized situation, the child, now with Revised Outcome 7 saying placement on the general education campus. Well, does the IEP say special education center because that's where the special education program is located, or is there a unique need to be at a segregated facility? Okay, so... I suspect a good number of them are the former. Okay, so I will address both your issues. The special education center, one, does not have to be a segregated facility. You could have general education children on a special education center. This is not about segregation. They want to make it about segregation. It is not. It's about safety. A special education center is designed so that a child cannot get out of that facility because all doors are locked and secured. Our children run. Our children don't understand when you go through a door into the street. This is why we have Victor Pineda's declaration of where we had a child on a general education campus found five miles away on Western and Imperial alone. And as the father says, only the Virgin Mary saved him from being dead. This is about safety, your honors. When you had the inclusion, okay, of the co-located campuses, and they talked the fence down, there was a reason for that fence. Not to keep the kids divided. There was nothing stopping bringing the general education children over to the special education center. Our parents welcome that. But when you take the special education center children over to a general education campus because of budgetary cuts, you don't have a nurse there every single day. And a child, one of these children could have a seizure. And you can't get that nurse there fast enough and you've got to find the locked gate. And this was what the parents were complaining about. And that's in the declaration of Julia Flores. You had these children being held at a locked gate for 15 minutes prone to sunstroke and seizures with no nurse. I want to address the issue of August to October, okay? If you look at the declarations of Rhonda Goldberg, she states things that happened October 8th. That's why I waited until October. Vince Fazi, the same thing. You had Juana Hernandez who states the aspect of it was only in late September, early October that an administrator finally admitted to her that the bruises to her sister were happening because of the inclusion activities. You also have the statements from the parents, from Frances Blen, about not knowing that they would transfer children visually impaired to a school where there are hills and barriers. Who would imagine a school district would transfer vision? Mr. Amster, is it your point that even though the revised outcome number 7 was made known publicly in a televised hearing in August of 2013, the plaintiff seeking intervention did not know about it until it affected their children? They did not, correct, they did not know that the district was not going to fulfill their promises and transfer their children to a safe facility. But that's not the finding that Judge Lew made. He found that in August, at least by August 2013, that all these putative interveners had learned about the revised outcome number 7. Did he not? That's probably correct. Timeliness is only one issue, but the issue, and timeliness is not overbroad completely, but the issue here was harm. In other words, what you had was representations being made to these parents, everything's going to be fine. The entire facility is going to be transferred onto the general education campuses. So in August, you had the meeting at Avalon and Banneker that is in the Declaration of April Flores, where it comes out, oh, we're going to transfer the kids or not, but we don't have the rooms ready or anything else. Then you have in September. What you're saying, if I understand it, is yes, the overall plan was made known to them, but at the same time there were representations that it would all work out and it would be fine. And as what happened between August and October was that the parents found out that it wasn't fine, that the safety of the children was imperiled. That is correct, and that's what our declarations show, and that's why the independent monitors report a year later is so important, because then it validates that the parents were right. Your declarations, I've got Goldberg here. Who else? Okay, so we have Rhonda Goldberg. We have Vince Fozzi. We have April Munoz. We have Steve Massada talks about the meeting with Robert Myers. We have Juana Hernandez. We have Cheryl Apana, which is very important, because Cheryl talks about at her... That's her last name. Apana, I'm sorry, Your Honor, A-P-A-N-A. She talks about how her child was being transferred from a special ed center to Lowell to receive a high school, and it was a transfer from a least restrictive environment to a most restrictive environment, basically just locking a child in a classroom in bungalows and having them eat and not have the facilities... Your point is that the interveners here didn't really appreciate or had no reasonable ground to appreciate the harm that the revised outcome 7 would do until they saw it on the faces of their children. That is correct, and that you have that with the declarations and you see the comparison of the pictures between the general facility. So this was... this is correct. They did not know the entire thing. So what, in your view, should be the decision of this Court? That we get remanded back to the district court, revise outcome 7, be determined that it's not valid. We are asking for that the law be followed. Individualized education plans. You can't make a generalized rule that you're going to transfer 33% of the children someplace without knowing what their individualized needs are. Wait a minute. Are you saying that what you want us to do is to reverse Judge Liu and enter with instructions to strike the revised outcome 7, or are you simply asking for intervention? I'm asking for intervention. I'm completely answering the question, but I want you to follow the procedural rules that you're allowed to do. So what I really want to address is this is not about parents arguing that we don't want inclusion. That's not what it is about. It's about an individualized education plan. Period. That should be happening no matter what happens in this lawsuit. But it is not. And isn't that best? I mean, what this is illustrating is that the class treatment may not be a particularly good fit for the problems because the problems are all, and the assessments of individuals are all something that needs to happen on an individual basis. So let me go point blank. The motion gets granted. Shonda Smith ends fast. The motion does not get granted. You're still here 20 years. The interveners have an incentive to bring this to an end, and it has to be brought to an end. You have in the declarations the fact that I am interacting with principals, with my nonprofit, in every single school practically because of the Superior Court Teen Court program. That's in there. I know what the principals want. I know what's happening. I'm sorry, but representations have been made here that are not true. Shonda Smith is killing us. We need individualized education plan. We need IDA followed. We need FAPE followed. That's all we need. Well, but all of that gets dealt with in individual IEPs and in due process hearings involving those individuals. Not when you have a revised outcome 7 that's mandating placement, and you have IEPs in front of you in the record where you can see that the placement option was solely made because of revised outcome 7. If that's factually true, it's not hard to predict the outcome of the individual litigation. Administrative judge cannot place a child back at a program where the school district no longer has, and that's the problem. You have class counsel. But a district court judge can order the school district to reopen a specialized education center, correct? Yes, and you're asking, but the same. Or can require the school district to pay for attendance at a private school that's maintained in that fashion. Because I want to just address two issues, number one. The special ed centers are still around. It's just the enrollment's not being allowed, but it's got to be done on a class situation systematically, and the problem that we have is so many parents in the southeast area don't know what to do, and really what's happening is they're abrogating from the system. They're just keeping their kids at home, and that's why you hear a truancy issue, and that's the most dangerous thing here. You need a systematic change. What is this about? This is about class counsel representation. So what you're saying is class counsel puts in a systematic effect, and now you're asking the parents to undo what the individual who's supposed to be representing them did? So the representative of them creates a harm, and you now want the parents to go through an extra procedure. That's not the purpose of a class action, and that creates exceptional circumstances. Class counsel should be representing all of his parents' interests and never create a barrier. The problem is the class doesn't have identical views as to how this should play out. But I believe that identical views can be created by individualized education plans. That's what I'm trying to say. Well, that suggests we should do away with the class. That's right. It's so fine. Dismiss Shonda Smith. That's fine. The problem that you have is, and you addressed it properly in your questions, class counsel does not represent any parents right now. They couldn't get a single declaration from a parent who has a child in LAUSD right now, only the original individuals, that they're out of touch. They're doing what they think is proper, not what the parents want. Parents are willing to confirm that based on the lawsuits that we see, there are parents that want their children moved into integrated settings. Yes. We get a lot of those. And there's no problem with that with the proper resources coming. You can move a program when you move the resources, too. Most school districts, and again, based on what I see, most school districts aren't as large as L.A.'s. And I haven't seen special education centers of the kind that Los Angeles has. Now, that may be a plus for Los Angeles, but it can't be the case that an education of a child compels the existence of special education centers because too many school districts don't have anything like that. Okay. So I would suggest you examine Ventura County. What you have on the other school districts is this. You have the special education center setting on a general education campuses. You have had the construction. That can be accomplished without maintaining the centers. We haven't lost the ability to provide the kind of security that you think is necessary in a general education setting. At millions of dollars, okay. L.A. USD is spending money for attorney's fees in the millions. And for MISES that came out of this, that is a boondoggle that class council won't abandon. I understand what you're saying, and that's why you're asking a question, what do we want? I go, I'm trying to create something that doesn't keep this litigation going. But it's time to come to an end where class council has no incentive on that. IEPs, there should never be a generalized rule like revised outcome seven that takes the power away of an individualized education plan. This is what happened here. And at the same time, so everything that is being suggested by the opposing side is antithesis to their position because they're talking about segregation. They think that the special ed children should be involved with general education children. We're not disagreeing with that. We want inclusion that's going to be with safety. We want the resources. We want these children to be safe. We want a parent to be able to drop their child off at school or have that child leave their house and come home without the parent worrying about that child leaving, about that child not getting the resources, about that child being bruised by a general education child because the proper teachings wasn't done in that general education child or there wasn't enough individuals like aides being present. That is the point. This is about safety. Thank you for your argument. We've kind of blown the clock altogether, but I'll give you your two minutes if you have something you think we really need to hear. I just quickly want to address counsel's argument that we have a due process, and I just want to note that California law is different. California Education Code requires, as this court determined back on IR versus LAUSD, that if the school district wants to initiate a change in a portion of the IEP that the parent doesn't consent under 5634F, it's the school district that needs to file the due process complaint. There's been no due process complaint filed by LAUSD against our parents. And the failure of the school district in that case to file gave the parents a victory on that particular piece, even though the parents lost on most of the substantive pieces. That suggests that the solution for your clients is to pursue their rights via due process hearing. But, Your Honor, what happens is that the due process we might win, but it's empty because what are we winning? First of all, it's systemic, so we'd have to take several cases to trial. Most of these families can't afford attorneys. These are families who are very low-income families. They can't afford it, and due process hearings are expensive. The other thing is that let's say an OAH judge agrees with us. Where are they going to place that child if the program's been moved onto a general education campus? Most programs are on general education campuses in most of the school districts where I see these cases. And a lot of those placements wind up being in much more expensive private schools paid for by the school district. If that's the alternative, it's there. But, granted, I agree that special education centers are special and unique to LAUSD, and they're also unique to the modified consent decree. It states in there on page 13 that special education centers shall remain part of the continuum of placement options for parents, and this is being taken away without recourse by the families unilaterally and systematically. Thank you. We thank all counsel for your helpful arguments in this complicated and difficult case. The case just argued is submitted.
judges: Farris, Clifton, Bea